## AFFIDAVIT

I, Matthew A. Masters, a Task Force Officer with the Drug Enforcement Administration (DEA) and a Detective with the Kansas City, Missouri Police Department, being duly sworn, declare and state:

1.      I, Matthew A. Masters, being duly sworn, state that I have been a Task Force Officer (DEA) and Detective since April 2019, and I am currently assigned to the Kansas City Division of the DEA.  I am specifically assigned to the Drug Enforcement Unit.  I am also a Detective with the Kansas City, Missouri, Police Department and have been employed by Kansas City, Missouri, Police Department for 29 years.  I have previously been assigned to the Kansas City, Missouri Police Department Narcotics Division (2004-2008) and again assigned there since 2019, performing tactical operations and conducting narcotics and weapons investigations.

2.      From my training and experience, my participation in this investigation, my review of investigation related reports, information, and items, from discussions with law enforcement officers, and from other various sources, I know the information contained herein.  This affidavit contains information necessary to support probable cause for this application.  It is not intended to include every fact or matter observed or known by me or by law enforcement.

3.      On June, 2, 2026, Kansas City, Missouri, Police Department ("KCPD") Vice Section conducted a Human Trafficking operation around Independence Avenue. KCPD Vice investigators were assisted by the Federal Bureau of Investigation ("FBI"), the Homeland Security Agency ("HSI"), and the Human Trafficking Taskforce.

4.      At approximately 3:25 p.m., HSI Special Agent Kade Castleberry was inside his HSI vehicle with Ms. Jessica Romero, a victim advocate, near Independence Avenue and Benton Boulevard, Kansas City, Missouri.  SA Castleberry's HSI vehicle was an unmarked silver Nissan Altima.

5.      SA Castleberry was operating within his scope and authority as a federal agent with the Human Trafficking Task Force.  SA Castleberry observed a young white female who he believed to be a minor and possibly the victim of human trafficking.  SA Castleberry believed the female looked to be approximately fifteen years of age.

6.      The female walked past SA Castleberry's vehicle and then conversed with several unknown individuals.  SA Castleberry and Romero then moved to the area of East 6th Street and Benton Boulevard, Kansas City, Missouri, where they continued to observe the female.

7.      The female then approached an unknown gold Chevrolet van and conversed with two unknown black males who were inside the van.  The female then walked away

from the van and approached SA Castleberry and Romero's vehicle. SA Castleberry rolled down the driver's window and the female asked him for a cigarette. SA Castleberry told the female he did not have a cigarette. The female walked away and entered the gold-colored van. The gold-colored Chevrolet Express van had Missouri temporary tag bearing 008KTKA. The van then traveled east on Independence Avenue.

8. SA Castleberry followed the gold van into the parking lot of the Family Dollar located at 3719 Independence Avenue, Kansas City, Missouri, located within the Western District of Missouri. However, because the parking lot was so congested, SA Castleberry's vehicle stopped directly behind the van.

9. SA Castleberry radioed the license plate and a description of the van to other investigators and tactical units in the area. SA Castleberry and Romero observed the van stop in the parking lot and a black male exited the left-rear passenger side of the van. The male had shoulder-length dreadlocks and was wearing a blue shirt and blue-jean shorts.

10. The black male walked along the side of SA Castleberry's vehicle and attempted to look past the window tint directly into the vehicle. SA Castleberry continued to travel slowly through the parking lot directly behind the Chevrolet van.

11. The black male then approached SA Castleberry's vehicle and stopped approximately three feet away from the driver's side window. The male again attempted to look past the window tint and appeared to say something. SA Castleberry rolled the driver's window down and asked the male, "What's up?" The black male asked SA Castleberry if he and Romero were following him. SA Castleberry attempted to de-escalate the situation and told the black male that he and Romero were trying to get to the Buy the Pound Thrift Store, located at 3757 Independence Avenue, Kansas City, Missouri.

12. The black male told SA Castleberry to "quit fucking following" him. The black male then retrieved a small black pistol from his pocket, displayed it in a manner so SA Castleberry could see it, and then pointed the firearm directly at SA Castleberry with an extended right arm. SA Castleberry stated the black male pointed the handgun directly at him through the window of the vehicle.

13. The black male continued to point the firearm directly at SA Castleberry as he walked from the agent's vehicle and headed back to the gold-colored van parked approximately 20 − 25 feet away. The black male then quickly concealed the pistol and re-entered the left-rear passenger side of the van.

14. SA Castleberry immediately radioed that an aggravated assault had just occurred and he provided the suspect information to additional law enforcement in the area. SA Castleberry and Romero parked nearby and continued to observe the van and its occupants until tactical units arrived. The van then parked at the Buy the Pound Thrift Store and the black male suspect exited the van.

2

15.     KCPD tactical officers Thomas Bradshaw and Kyle Foster arrested the black male who had pointed the firearm at SA Castleberry. The black male was taken to the ground and placed in handcuffs. As Officer Bradshaw rolled him over, the black male informed the arresting officers that he had a gun in his front right pocket.

16.     The officer removed the handgun from the black male's right pocket. The black male was identified as **James E. JACKSON**, B/M, DOB: 06/27/1991.

17.     Officers determined the handgun was a black Sturm, Ruger & CO LCP, .380 caliber handgun, bearing serial number 371238208. The firearm was loaded with five (5) live rounds of ammunition in the magazine, and one (1) live round in the chamber. The headstamps on the ammunition were all "ACP .380."

18.     A computer check of **JACKSON** revealed that he has an active Missouri Probation and Parole violation warrant with no bond. **JACKSON** was flagged as a subject known to resist arrest, and as a violent offender and/or a serious threat to law enforcement officers. **JACKSON** is also known to be armed and dangerous.

19.     Officers confirmed **JACKSON** is a prior convicted felon and he is therefore prohibited from lawfully possessing firearms. Officers held **JACKSON** on an investigative hold for aggravated assault on a law enforcement officer and for being a felon in possession of a firearm.

20.     Because investigators previously observed **JACKSON** and the white female occupy the gold Chevrolet Express van, tactical officers also conducted a car check of that vehicle and removed and identified all the occupants.

21.     Officers identified the white female as Alexis Lord W/F 02/22/2005 who sat in the right front passenger seat. Officers identified the driver of the vehicle as Ronald A. WILSON, B/M, DOB: 09/10/1986. Wilson claimed to own the vehicle.

22.     Upon opening the doors to the van to clear it for officer safety, officer Foster recovered a clear plastic baggie containing 1.58 grams of a crystal-like substance on the floor of the van in the second row of seats where **JACKSON** had been seated.

23.     KCPD SWAT II Officer Arkeem Young field-tested the crystal-like substance using the TruNarc device which yielded a positive reaction for the presence of methamphetamine.

24.     On June 2, 2026, at approximately 7:09 p.m., I went to conduct an in-custody interview with **JACKSON**. I informed **JACKSON** of his *Miranda* rights, and he agreed to participate in the interview.

25.     **JACKSON** signed the *Miranda* waiver at 7:12 p.m., and he voluntarily completed the Detective Investigative Report.

3

26.     **JACKSON** admitted he was on parole, had served prison time, and was a former Five Ace Deuce gang member.  That gang was a well-known violent 12th Street gang in Kansas City, Missouri.  The gang was previously associated with gangs from 24th Street through 27th, 51st, and 57th Street.  The alliance of these gangs were known as "512," "5 ace 2," or "5 ace deuce" and was a well-documented violent street gang in the Kansas City area.  The gang was known for narcotics trafficking, stolen autos, and violent crime.  **JACKSON** was asked how many vehicles he had stolen over the years and he replied, "probably fifty."

27.     During the interview, **JACKSON** said he wanted to provide a "run down" of his previous two weeks.  **JACKSON** explained that he had been shot at near 7th and Benton Boulevard.  **JACKSON** said he was shot in the foot, but it was an "in and out" and that he did not go to the hospital or report the incident to police.  **JACKSON** said he was being followed and chased by a person named "Tonka."

28.     **JACKSON** stated the disagreement with "Tonka" stemmed from **JACKSON** recently kicking "Tonka" out of his apartment.  **JACKSON** said he believed "Tonka" knowingly provided his friend with fentanyl instead of cocaine.  According to **JACKSON**, this caused the overdose death of his friend "Lil John."

29.     **JACKSON** admitted, "I know I'm not supposed to have a gun" but rationalized (possessing a gun by) saying he "live[s] in the hood."  **JACKSON** said he "was scared as fuck all the time."  **JACKSON** reasoned that he "wasn't a gangster" anymore and that he also wasn't a drug dealer and that he was simply trying to work.

30.     **JACKSON** admitted he "ended up buying a gun off the streets."  He said, "I'm not gonna deny it…I accept my wrong."  **JACKSON** admitted he bought the gun and a "bag of bullets."  He claimed, "I bought the gun not to rob [people] but to protect myself."

31.     Officers redirected **JACKSON** and asked him what crime he committed that resulted in him becoming a convicted felon.  **JACKSON** admitted he was a felon for "stealing cars."  **JACKSON** said he was convicted in 2023 and said he did "two and half…almost three years" in prison.  **JACKSON** said, "I just got out in April."

32.     **JACKSON** said he figured he had a parole violation warrant.  **JACKSON** explained he had ignored his requirements to report to the parole officer.

33.     During the interview, **JACKSON** explained that he was in the back passenger seat of a gold Chevrolet Express van that belonged to his friend Ronald Wilson.  **JACKSON** claimed he and Wilson have been living out of the van momentarily.  **JACKSON** also said his "home girl" named "Boo" was with him but then corrected himself saying that "Boo" was closer to Wilson than to **JACKSON**.  **JACKSON** acknowledged that "Boo" likely used drugs and indicated she "wasn't all there."  **JACKSON** later acknowledged that "Boo" approached the silver Nissan and asked for a smoke.  He would not admit whether he knew if she approached the Nissan for solicitation purposes.

4

34. Officers redirected **JACKSON** to explain what had happened when he was contacted by police officers. **JACKSON** said he and Wilson had been looking for "some girls to kick it with." **JACKSON** said he was around Kensington Avenue (near Independence Avenue) and that he had been shot at in that same area a few days ago.

35. **JACKSON** said he noticed the silver sedan sitting in the area and he told Wilson that they should get out of there because the "block was hot." **JACKSON** explained that he told Wilson they should go to Lee's Summit, Missouri, where it was safer. He said Wilson agreed.

36. **JACKSON** said he and Wilson left the area of 7th Street and Benton and headed to Kensington when he and Wilson ran into "Boo" on the way. **JACKSON** said they called "Boo" over to the van at which time they saw the same silver Nissan again. **JACKSON** said, "Look I just got shot at over here and I don't know who these people are…I can't tell because [of] their tint." **JACKSON** told officers that Wilson said "Let's go" meaning they should leave the area.

37. **JACKSON** then defiantly said, "No…I'm not trying to die today" and said he (**JACKSON**) wanted to stay in the area despite Wilson's desire to leave. **JACKSON** said they then went to the Family Dollar where **JACKSON** told Wilson, "Fuck that…I'm not just gonna keep being a pussy…you're not just gonna keep pushing me over bro…never…none of that." **JACKSON** explained that he got out of the backseat of the van and confronted the occupants of the silver Nissan asking, "Why are you following me bro." **JACKSON** later explained that he had been seated directly behind Wilson (in the driver's seat) and that "Boo" had been in the front right passenger seat.

38. **JACKSON** said he saw a "Mexican dude" and thought this individual was with "Tonka" who he previously mentioned having a dispute with. **JACKSON** admitted he told the man (i.e., the HSI Special Agent), "You all need to leave me the fuck alone and stop following me." **JACKSON** acknowledged SA Castleberry told him, "We're not following you."

39. **JACKSON** raised his voice indicating he was irritated with the Nissan because he felt it was following him and he said again, "Bro you need to stop following me…leave me the fuck alone". **JACKSON** admitted, "I pulled my gun out…I really wasn't trying to shoot nobody…but I just wanted em to see I got a gun now…so stop shooting at me."

40. **JACKSON** initially said he pulled the gun out of his pocket, displayed it and then put it back in his pocket while saying to the reporting detective, "I let them know." **JACKSON** minimized his actions saying that he didn't have his finger on the trigger. **JACKSON** continued, "I started to walk away and they just sat there." **JACKSON** said he returned to the van where he told Wilson he didn't know who was inside the Nissan. **JACKSON** said he was getting ready to go into the nearby thrift store to buy "Boo" some clothes when the police arrested him.

5


*Photo of **JACKSON** brandishing firearm.*

41. Officers asked **JACKSON** whether he pointed the gun at the person(s) inside the silver Nissan. **JACKSON** said he pointed the firearm at the ground for "safety in case the gun went off." **JACKSON** demonstrated that he was waving the gun around in an aggressive manner which appeared to be threatening.

42. **JACKSON** agreed his actions could have seemed threatening to anyone seated inside the silver Nissan.

43. Officers asked **JACKSON** whether he saw anyone else inside the silver Nissan and he replied, "It looked like there was a chick in there." **JACKSON** stated he had no idea who was in the vehicle, but he assumed they were "Mexican" and again reiterated that he had been shot at four times in the last three weeks.

44. **JACKSON** said the methamphetamine found near where he was seated inside the van did not belong to him. He said that he believed the drugs belonged to "Boo." **JACKSON** stated that Wilson does not use drugs, and he claimed that he only uses marijuana.

45. **JACKSON** again admitted knowing he was not supposed to have a firearm and that since he was a convicted felon he was prohibited from owning or possessing a firearm.

6

46. Officers asked **JACKSON** if he observed the person he pointed the gun at who sat inside the silver Nissan. **JACKSON** admitted, "I realized that he was a cop…I was like oh shit…but I was actually relieved…because at least it was a cop."

47. On June 2, 2026, at approximately 7:53 p.m., I conducted an in-custody interview with Ronald Wilson. Before speaking with Wilson I advised him of his *Miranda* rights and he agreed to participate in the interview.

48. Wilson signed the *Miranda* waiver at 7:55 p.m., and he voluntarily completed the Detective Investigative Report.

49. During Wilson's interview he said he owned the 2004 Chevrolet Express van. Wilson said he currently uses his mother's 7103 College Avenue address but that he has been recently sleeping in his van. Wilson acknowledged knowing **JACKSON** for seventeen (17) years.

50. Wilson explained that he gave **JACKSON** and "Boo" (Alexis Lord) a ride near Independence Avenue. He said that he knows Lord is a known prostitute and that **JACKSON** pointed out the silver Nissan sedan to Lord noting that the occupant of the vehicle was "checking her out."

51. Wilson said **JACKSON** directed Lord to approach the Nissan and ask him what he wanted which he interpreted as solicitation for a sex act. Wilson said after Lord returned from contacting the Nissan she said, "He already has a girl in there." Wilson said Lord then got into his vehicle and **JACKSON** entered the backseat area of the van and was initially seated directly behind Lord.

52. Wilson said as he took Lord and **JACKSON** to the nearby thrift store **JACKSON** noticed they were being followed by the silver Nissan from earlier. Wilson said **JACKSON** decided to confront the occupant of the silver Nissan. Wilson said he did not see (**JACKSON** with) a gun but he figured **JACKSON** likely did have a gun on him. Wilson believed this because **JACKSON** had been talking about being shot and the circumstances surrounding those incidents.

53. Officers asked Wilson about the narcotics located where **JACKSON** had been seated in the backseat of his van. Wilson said he was positive that the methamphetamine likely belonged to **JACKSON**. Wilson said both **JACKSON** and Lord are methamphetamine users and that they often hang out together. Wilson said, "They do their thing." Wilson said he does not use any drugs. Wilson said the second time **JACKSON** jumped out of the back of the van he had switched seats and was directly behind him before he got out. Wilson said Lord was never in the back seat area of the van and that only **JACKSON** was.

54. Wilson said he knew **JACKSON** was a convicted felon and had served time in prison.

7

55. On June 2, 2026, at approximately 203 hours, I went to conduct an in-custody interview with Alexis Lord. However, I contacted Lord in the detention cell but she refused to speak with me. Therefore, I did not try to interview her regarding this incident.

56. ATF Special Agent Stephen White, an interstate nexus expert, said the Sturm, Ruger & CO LCP, .380 caliber handgun, bearing serial number 371238208, and the six (6) live rounds of ammunition in the magazine, traveled in interstate commerce before June 2, 2026, and they were not manufactured in Missouri.

57. A review of **JACKSON's** criminal history revealed he was previously convicted of several offenses punishable by terms of imprisonment exceeding one year. They include:

    a. On June 11, 2011, **JACKSON** was convicted of vehicle tampering in the first-degree case number 0916CR0226701 in the Circuit Court of **JACKSON** County. Missouri. He was sentenced to four (4) years of confinement (which was suspended) and he was placed on three (3) years of probation.

    b. On September 20, 2012, **JACKSON** was convicted of fleeing or attempt to elude case number 12CR658 in the Douglas County District Court of Kansas. He was sentenced to 6 months' confinement (which was suspended), and he was placed on probation. And on June 18, 2013, his probation was revoked and the original confinement sentence was imposed.

    c. On March 19, 2013, **JACKSON** was convicted of vehicle tampering in the first-degree in case number 1216CR0270901 in the Circuit Court of **JACKSON** County. Missouri. He was sentenced to four (4) years of confinement (which was suspended), and he was placed on five (5) years of probation.

    d. On March 19, 2013, **JACKSON** was convicted of resisting arrest/detention/stop with risk of death or injury in case number 1216CR0270901 in the Circuit Court of **JACKSON** County. Missouri. He was sentenced to four (4) years in the Missouri Department of Corrections.

8

e.   On October 26, 2023, **JACKSON** was convicted of vehicle tampering in the first-degree in case number 2316CR04520 in the Circuit Court of **JACKSON** County. Missouri.  He was sentenced to four (4) years in the Missouri Department of Corrections.

FURTHER AFFIANT SAYETH NAUGHT.

DET. _[signature]_ # 4371

Matthew A. Masters
Task Force Officer
Drug Enforcement Administration

~~Subscribed to and sworn to before me~~

this   5th   day of June 2026.

_[signature]_

HONORABLE SARAH W. HAYS
United States Magistrate Judge
Western District of Missouri

9